James ¡S. Brown, J.
This is a proceeding in eminent domain to acquire a square (block for a low-cost housing site. The parcel involved here was known as No. 135-137 Third Avenue, Brooklyn.
In fixing the amount of just compensation to be awarded, the court must first determine when the property was appropriated by the city. The city contends that title vested on June 3, 1968 under a de jure appropriation. The claimant contends that due to the general knowledge of the condemnation in the area and the activities of representatives of the City Housing Authority in and immediately after the month of August, 1967, a de facto appropriation of the property took place about that time.
In various definitions of market value by the courts, appear the words ‘ ‘ under ordinary conditions ’ ’ or under ‘ ‘ ordinary circumstances ” 'or words of similar import. Ordinarily, just compensation is measured by the fair market value of the property taken as of the date of vesting title. Generally speaking, that is still the general rule, but even that must yield to exceptional circumstances, for each case necessarily involves different facts and must be considered by itself (Matter of Board of Water Supply of City of New York, 277 N. Y. 452).
These premises consisted of a four-story building, with two ground floor stores and apartments on three floors above, on a plot 42 feet by 100 feet. There were 18 apartments, ranging from 3 to 5 rooms and bath, all of which were fully occupied until shortly before October, 1967.
The proofs adduced, particularly the testimony of the site manager employed by the New York City Housing Authority, show that he was employed to supervise this project “ in the middle of 1967”; that shortly after the middle of 1967, his employees, at his direction, began to call on each of the tenants in this block, including those in this building, to advise them of the contemplated condemnation. One of the former tenants, through a ¡Spanish interpreter, testified that two employees of the Housing Authority called to see her on or about *1075 August '21, 1967 and gave her a letter on the letterhead of the Housing Authority dated on that date, which letter was headed “Baltic Street — Third Avenue Area,” and at the same time gave her a pamphlet entitled “ Relocation Benefits and Services” which has on its cover “ New York City Housing Authority 250 Broadway.”
This letter starts: “ A.s you probably know, the Board of Estimate has approved the plan and project for a low rent housing development in this area.” It then goes on to tell the recipient how to go about getting relocated. It assures the recipient “ You do not have to move now ” and states that a representative of the Housing Authority “will contact you shortly to determine your eligibility for an apartment in public housing.” Another sentence reminds the recipient, “ You are required to move out all furniture and personal belongings ”. Another sentence on page 5 reads: “ As a tenant of a building on a public housing site, you will be given high priority if you are eligible for an apartment in a public housing development.” It will be noted that this sentence is in the present tense and treats the property as already condemned for public use.
This booklet also sets forth the cash payments to which these tenants may become entitled, and states that the maximum for moving expenses and loss of property is $200, but also: “ The actual amount of relocation adjustment payment will be based on your family income. The maximum that can be paid is $500.” This tenant also testified that when these two city representatives spoke to her in August, 1967, they advised her that she would have money coming to her from the city. This was confirmed by the site manager who stated that these employees who worked under him were directed by him to tell the tenants that they would be entitled to moving expenses, if they moved out prior to condemnation.
This tenant, and also the owner, testified that immediately after these letters and pamphlets were distributed throughout the house, tenants begun to move out and the vacated apartments were promptly vandalized, with thefts of refrigerators, stoves, kitchen tubs, etc. By October 1, 1967, the owner testified — and he was not contradicted — half of the tenants had moved and most of the others refused to pay any rent because of the assurance of the employees of the Housing Authority that they had money coming to them from the city.
By the time the 1967 cooler weather came in, the landlord was getting practically no income whatsoever. None of the vacated apartments could be rerented 'because of the vandalism and also because the impending condemnation had been noised *1076 throughout the area by the City Housing Authority employees. As a result, the landlord could not raise the necessary funds for repairs or fuel, and by November, about 75% of the tenants had vacated.
Counsel for the city throughout the trial contended that it was not the impending condemnation or the importuning of the tenants by the City Housing Authority with offers of payment of moving expenses if they moved prior to condemnation, but rather a series of Building Code violations going back to 1964, and lack of heat in midwinter 1967-1968, that caused the rapid exodus of the tenants.
The court observes, and it is significant, that despite such violations the building continued to be fully rented in July-August, 1967, when it was first appraised by the city’s appraiser and it was not vacated until the tenants were showered with notices by the Housing Authority of the proposed condemnation and offers of new apartments and payment of moving expenses for those who moved out prior to condemnation. The court is convinced that it was the activities of the Housing Authority and not building violations that prompted the tenants to vacate and leave an almost empty building which as might be expected became a target for theft, vandalism and destruction, which, according to the city’s own appraiser, was reduced in value by some $27,000 in a period of 10 months, when the city appraiser appraised it for the second time.
■Sixteen of the 18 tenants in the building had been receiving welfare assistance, and in December, 1967 the Welfare Department sent a form letter dated December 26, 1967 to the few tenants who were still in possession, discontinuing all rent payments.
Meanwhile, violations piled up and on January 22, 1968 notices cutting the rents in half were served, which proved a useless gesture. At or before that time, the owner, with the co-operation of the first mortgagee who was willing to subordinate his mortgage, called upon the city through its HUM Bureau (Housing Resources and Maintenance dorp.) for temporary relief. After some delay in processing, he was advised by a Mrs. Davidson of that bureau that, since title vesting by the city was too close, no relief could be granted to him. This was all confirmed by the testimony of the mortgagee who had also spoken to Mrs. Davidson of this city bureau.
Finally, the city vested title on June 3, 1968, over 10 months after it had let everyone know that the property was being condemned. There certainly was an undue delay between the *1077 planning stage and the taking date, for which no explanation was offered.
In spite of all this background, it is the contention of the city that the owner is entitled to be compensated only for the entirely vandalized shell of a building that remained on the vesting date. The city’s own expert admitted that he had been retained to appraise this property in July or August, 1967, and that when he had examined it in July or August, 1967, he found it to be fully rented. He then testified that he had fixed the then value of the premises at $41,000. He also said he had taken the then existing violations and condition of the property into consideration.
However, he also reappraised the premises a second time as of the vesting date, June 3, 1968, at $13,900, although at that time, the assessed value of the property was still $40,000. By then it was entirely vacant and boarded up.
The city may not by virtue of a condemnation and by its own action cause a depreciation in value of property to be condemned and then claim that just compensation is that depreciated value. The contention of the city that the award herein must be based on the value of the property as of the vesting date, June 3, 1968, cannot be accepted. As was stated by the court in Foster v. City of Detroit (254 F. Supp. 655 [June, 1966]): “If it were, condemning authorities could deprive thousands of property owners of the ‘ just compensation ’ to which they are entitled under the Fourteenth Amendment, by the simple procedure of commencing a condemnation action, prolonging it while they encourage deterioration of the area by filing a lis pendens, tearing down some buildings, ordering welfare tenants to move, etcetera, and then abandoning it and commencing new proceedings at which awards are based solely on value at that time.”
In City of Buffalo v. Strozzi (54 Misc 2d 1031, 1035, 1036, 1037, 1038 [Oct. 1967]) the court said:
“ The time table of the various proceedings commenced by the city under article 21 of the City Charter which authorizes condemnation proceedings began as early as 1954 when the Waterfront Development Project was initiated by the City Planning Commission. The Federal Housing and Home Finance Agency approved the city applicable for a Federal grant allocation in March, 1960. The City Planning Board held a public hearing on urban renewal plan for the waterfront project on September 16,1963. The final approval was received by the city from the Housing and Home Finance Agency in May of 1964. The contract was executed in July of 1964, and *1078 the State grant contract on this same development project was executed in July of 1966. The petition in condemnation was filed in the office of the 'Clerk in Erie County on January 12, 1967, and the order in condemnation was entered in the office of the Clerk of Erie County on March 31, 1967. * * #
“It is apparent, therefore, that this property is located in an area the whole of which was to be taken for the urban renewal waterfront program including all of the buildings located in the take area and as time went on it became less desirable and the tenants occupying the premises sought other places to reside, and this One Top Corporation in particular became vacant and abandoned in all respects, unsuitable as an operating habitable structure. * * *
“It is the conclusion of the court there was a de facto condemnation by the City of Buffalo against One Top Corporation prior to the formal filing of the petition in condemnation on January 12, 1967. This de facto condemnation occurred when the city through its 'Common Council adopted a resolution determining to take the properties set forth and described in the urban renewal plans for the Waterfront Redevelopment Project. * * *
“ Proposed public improvement should not be permitted to diminish the value of land in the area of improvement (Brainerd v. State of New York, 74 Misc. 100,105), in which the court said:
‘ The fact that the land in this instance is to be used in connection with a public improvement made by the 'State must not be allowed to operate to enhance or diminish, its value. ’ (Emphasis by this court.) ”
(See, also, United States v. Miller, 317 U. S. 369, rehearing den. 318 U. S. 798.)
In 1961 the United 'States Supreme 'Court applied the principle of the Miller case (supra) to cases where condemnation caused a depreciation in value. In United States v. Virginia Elec. Co. (365 U. S. 6124, 636) the court said: “ The court must exclude any depreciation in value caused by the prospective taking once the Government ‘ was committed ’ to the project. United States v. Miller, supra at 376-377; see United States v. Cors [337 U. S. 325] at 332. * * * As one writer has pointed out, ‘ [i] t would be manifestly unjust to permit a public authority to depreciate property value by a threat * * * [of the construction of a government project] and then to take advantage of this depression in the price which it must pay for the property ’ when eventually condemned.”
This was not a new proposition advanced for New York. In 1911, it was dealt with in Brainerd v. State of New York *1079 (supra, p. 106), in which the court said: “ The market value must he fixed without regard to the prospective improvement. The question usually put to witnesses is, 1 What was the market value of the property before the appropriation? ’ This question means, what was it worth before the appropriation and without considering the proposed improvements? Because the State contemplates an improvement, it should not be made to pay for the enhancement in the value of property that follows the announcement or construction of the improvement, where it benefits property specially, nor should claimants be made to suffer the damages resulting therefrom where it produces a special depreciation in the value of the property.”
In 1956, the Appellate Division, First Department, in a unanimous decision (Matter of City of New York [Major Deegan Blvd.], 1 A D fid 807) stated: “ The imminent taking of the property in condemnation following the restoration of the vacant premises may well have prevented the owner from procuring tenants * * * . Accordingly, there should be a further hearing for the purpose of redetermining the award and receiving such additional evidence as the parties may wish to proffer as to the rental value of the premises, except for the fact of condemnation, on the date of taking ”.
In Matter of Port Auth. Trans-Hudson Corp. (Hudson Tubes) (43 Misc 2d 485, 497-498 [1965]) the court said: “ The court believes the rents were depressed and abnormal, the result of transitory events — bankruptcy of the owner, rumors and threats of condemnation — factors definitely militating against obtaining better rentals. Under those circumstances, the buildings were not in competitive condition and position to bargain for and to secure fair open-market rentals.”
In Murray v. United States (130 F. 2d 442, 444 [1942]) the court stated: ‘ ‘ the duty of the jury was to fix the value without regard to any increase or decrease resulting from the government project.”
The text writers have also covered this subject. Respected and cited texts carry it this way: “ If the proposed improvement had depreciated the value of the property, it would be very unjust that the condemning party should get it at its depreciated value, and the correct rule would seem to be that the value should be estimated irrespective of any effect produced by the proposed work.” (2 Lewis, Eminent Domain, § 745 [3d ed., 1909].)
In Nichols, Eminent Domain (vol. 4, § 12. 3151 [3d ed., 1962]) it is stated in the text: ‘‘ The general rule is that any enhance *1080 ment in value which is brought about in anticipation of and by reason of a proposed improvement is to be excluded in determining the market value■ of such land. * *. # The rule of exclusion has been applied also to consideration of the effect of the taking in depressing the value. It has been said that ordinarily the fact that property is, or is about to be, condemned for public purposes does not diminish or destroy its value. * * *
“It is well settled that in such case in valuing the land the effect of the proposed improvement upon the neighborhood must be ignored.”
The Committee on Land Acquisition Law and Procedure, appointed by the Governor, made its report in March 1966 on the status of the condemnation law and at page 161 it stated: “ (3) Effect of imminence of condemnation: Any change in the fair market value prior to the date of condemnation due to the general knowledge of the imminence of condemnation shall be disregarded in determining the fair market values.”
The Committee on Public Works of the House of Representatives in its report of December ‘22,1964 on the study of decreases in market value affected by real property acquisition in Federal and Federally assisted programs stated:
‘ ‘ 2. decrease in market value.
“ The principle of the Miller case (supra) is also applied to protect the property owner in the case of decreases in the value of property caused ¡by a project # * *
‘1 In some programs property values may decrease because of preliminary actions by public officials or the announcement of a proposed project and the prospect that the property probably will be taken for the project. Where this occurs several years before the actual taking, especially in urban areas, tenants move out or fail to renew their leases and new tenants cannot be obtained, buildings are abandoned, the neighborhood deteriorates or is deserted and vandalism sets in. By the time the property is taken, values frequently have decreased sharply * * *.
11 It has been suggested, however, that proper application of the Miller rule requires that all decreases in value of the property caused by the project be disregarded * * *. (See, also, City of Cleveland v. Carcione, 190 N. E. 2d 52 [Ohio 1961]; Tharp v. Urban Renewal & Community Development, 389 S. W. 2d 453 [Kentucky 1965]; State v. Carswell, 384 S. W. 2d 407 [Tex. Civil App. 1964]; State v. Virginia Electric & Power Company, 365 U. S. 624.) ”
*1081 The city in its 'brief cites as an authority the decision of Special Term of the Queens County Supreme Court of Cinco v. City of New York (58 Misc 2d 828) where a motion for summary judgment was denied. The facts there were not at all similar. The court did say however (p. 830): ‘ ‘ Ordinarily, in the absence of direct governmental interference with the use and enjoyment of property, a de facto taking will not be held to exist (29A C.J.S., Eminent Domain, § 135, pp. 533-634; cf. Rosenberg v. State of New York, 24 Misc 2d 960 [Court of Claims, 1960]) ’ ’ and at the end of its decision stated (p. 832): “ In the condemnation proceedings, plaintiffs will have the opportunity to present their claim for damages in its entirety.”
This court does not dispute that the question involved here is entirely an issue of what is “ just compensation ” under the circumstances.
In its brief, the city stresses the numerous Building Department violations existing in August, 1967. Be that as it may, the fact remains, as heretofore stated, that the city expert made a thorough examination of the building that very month and testified he was aware of those violations but nevertheless valued the premises at $41,000 as of that time.
The property in question here was purchased by the claimant on June 10, 1963 for $45,000 with $7,000 cash and the balance by way of a purchase-money .mortgage for $38,000. At that time the gross rents were $9,500. In due time the registered rents were legally increased to $14,000 by reason of the investment of additional capital for refrigerators, storm windows, new gas stoves and the like and by reason of the allowable 15% increases when vacancies occurred; and the purchase-money mortgage was decreased by amortization payments of some $4,000.
The court holds as a matter of law that under the circumstances here the just compensation due this owner was the fair value of this property during the month of August, 1967 when it was fully rented and when there was an inspection and appraisal by the city appraiser; there was then a de facto taking by the city (City of Buffalo v. Strozzi 54 Misc 2d 1031, supra; Foster v. City of Detroit, 254 P. Supp. 655, supra).
The city appraiser testified the value at about that time was $41,000, even with the many Building Department violations then existing. The assessed value continued to be $40,000.
The owner’s appraiser found that at that time the value was $50,000.
The court fixes the value at $45,000 and awards that amount, with interest at 4% from September 1, 1967.
*1082 The entry of the decree shall be without prejudice to the right of the claimant to apply to this court for a modification thereof for payment by the city of additional interest in the event any of the appeals now pending in any of the Appellate Divisions should affirm the payment of interest at a rate above the aforesaid 4% amount.