James J. Leff, J.
On June 20, 1963, the plaintiff, 2814 Food Corp., signed an agreement leasing real property owned by the defendant, Hub Bar Building Corp., at Broadway and 109th Street in Manhattan. The property was then improved with four stores and a garage. The parties contemplated an extensive alteration of the property to adapt it for use by the tenant as a supermarket. The lease obligated the landlord to obtain possession of those portions of the leased premises then occupied by other tenants and gave the landlord until July 1, 1964 to obtain possession, with an option under which the tenant was permitted to extend the landlord’s time to obtain possession of the premises up to December 31, 1964. If the landlord failed to procure possession by such date, the lease was to be abrogated (par. 30th). Paragraph 31st gave the landlord seven months after obtaining possession of the entire premises to complete certain extensive alterations (¡Schedule A of the lease) which it had agreed to make, “ it being further agreed that any delays caused by strikes, unavailability or delay in delivery of materials, or other causes beyond the landlord’s control, which may prevent the landlord from completing the aforesaid work within the said seven months period, shall be added to the time fixed for the completion of the landlord’s work.”
On the signing of the lease, the tenant deposited $37,350 with the landlord, $34,600 of which represented security (par. 15th) and $2,750 represented the first month’s rent payable in advance. The rent to be paid was fixed at $33,000 a year during the 1st through the 4th years of the term of the lease, $35,000 a year during the 5th through the 8th years, and $37,000 a year *82 during the 9th and 10th years. Paragraph 57th granted the tenant the option to renew the lease for a further term of 11 years at an annual rent of $39,500, thus making the total contemplated term of the lease 21 years. If the tenant at the beginning of the 10th year did not exercise the option, it was obligated at that time to pay the landlord $25,000, ‘1 as reasonable compensation to the landlord for all monies expended by it in connection with all alterations and improvements made in the demised premises and for obtaining possession of the demised premises from the tenants and occupants thereof at the time of the execution of this lease agreement, as mentioned in Paragraph 1 27th ’ hereof, which sum of $25,000 shall be due and payable to the landlord, without further demand, on the first day of the tenth year of the term of this lease agreement ’ ’.
The lease provided that when the landlord completed those alterations that it was obligated to make and pay for under the lease, it was to give notice to that effect to the tenant. Paragraph 37th fixed the time of the commencement of the term of the lease and also fixed the time of the commencement of the obligation to pay rent. It reads: “ 37th. It is agreed that the term of this lease shall commence from such date as the land-land completes such work in the demised premises on its part to be done and performed, as hereinabove mentioned and set forth, notice of which shall be given by the landlord to the tenant by certified mail requiring a return receipt and rent for the demised premises shall commence sixty days thereafter or on such date as the tenant opens the demised premises for business, whichever date shall occur sooner, it being understood and agreed that at the time said rent shall commence the landlord shall have a temporary or final Certificate of Occupancy for the demised premises, provided that the issuance of such temporary or final 'Certificate of Occupancy is not prevented by any work then to be done in the demised premises by the tenant. In the event a temporary Certificate of Occupancy is issued at such time, it is agreed that a final Certificate of Occupancy will be applied for by the landlord at its own cost and expense at such time as the tenant completes its work in the demised premises as hereinabove mentioned and set forth.”
The landlord sent the notice provided for under paragraph 37th to the tenant on March 26, 1964. After the landlord’s notice of completion of landlord’s work was sent on March 26, 1964 and while the tenant’s work was in progress, the landlord sent a letter under date of April 14, 1964, advising the tenant of action taken by the Board of Estimate with regard to the proposed taking by the city. The letter concluded: “ However, *83 we are passing this information on to you so that you may take such steps as you may deem appropriate to protect your interests.”
The contractors who had ¡been employed by the tenant thereafter, at the tenant’s direction, stopped the work that each had been engaged in at various stages of its completion. The tenant never completed the installation of the improvements and equipment or took any other steps that would have enabled it to open for business. On August 12, 1964, an order in a condemnation proceeding vested title to the property in the City of New York. The taking was for the purpose of extending the schoolyard of the contiguous public school building.
The defendant has in its possession the sum of $5,145.17, plus $1,821.49 representing interest earned on the security, or ,a total of $6,976.66. After the commencement of this suit, the defendant returned $32,204.83 to the plaintiff. The plaintiff seeks to recover the moneys retained by the defendant as rent claimed.
The tenant asserts the claim that the landlord’s work as provided for in ¡Schedule A was not completed, assigning as an objection the landlord’s failure to remove the rubbish and debris remaining after the completion of the other work. The court does not consider this claim of any consequence. It appears that no more than $75 in carting charges would have been required to complete this inconsequential requirement. The court holds that at March 26, 1964, the landlord had performed all those conditions of the lease that it was obligated to perform up to that time.
The tenant’s further claim, its third cause of action, is based upon a failure of consideration.
At the time the parties entered into their lease, they contemplated the use and occupancy of the premises as a supermarket for a long period of years, during which time the tenant’s business would be the source from which the landlord would receive rent from the tenant. The question presented by this action is whether there has been a frustration of the agreement between the parties antedating the actual vesting of title in the city so as to relieve the tenant of its obligation to complete the alteration and to embark on the conduct of its business and to relieve it of its obligation to pay rent under the terms of the lease.
The principle of frustration was first enunciated in Krell v. Henry (1903), (2 K. B. 740). In that case the contract involved the use of Mr. Krell’s chambers “in the daytime of June 26 and 27, for the sum of 75?., 25?. then paid, balance 50?. to be paid on the 24th, the premises, third floor, 56a Pall Mall” *84 (pp. 749-750). The letting was entered into with the understanding that the royal coronation procession might be viewed from the windows of the premises on both days. The court held that the rooms were let for the purpose of seeing the royal procession and that the cancellation of the procession on the days originally appointed frustrated the condition or state of things that were the foundation of the .agreement.
The court laid down the test in the following terms (pp. 751-752): “Each case must be judged by its own circumstances. In each ease one must ask oneself, first, what, having regard to all the circumstances, was the foundation of the contract? Secondly, was the performance of the contract prevented? Thirdly, was the event which prevented the performance of the contract of such a character that it cannot reasonably be said to have been in the contemplation of the parties at the date of the contract? If .all these questions are answered in the affirmative (as I think they should be in this case), I think both parties are discharged from further performance of the contract. I think that the coronation procession was the foundation of this contract, and that the non-happening of it prevented the performance of the contract; and, secondly, I think that the non-happening of the procession, to use the words of iSir James Hannen in Baily v. De Crespigny [L. R. 4 Q. B. 185], was' an event ‘ of such a character that it cannot reasonably be supposed to have, been in the contemplation of the contracting parties when the contract was made, and that they are not to be held bound by general words which, though large enough to include, wure not used with reference to the possibility of the particular contingency which afterwards happened.’ The test seems to be whether the event which causes the impossibility was or might have been anticipated and guarded against. It seems difficult to say, in a case where both parties anticipate the happening of .an event, which anticipation is the foundation of the contract, that either party must be taken to have anticipated, and ought to have guarded against, the event which prevented the performance of the contract. ’ ’
Williston, Contracts (Rev. ed., 1938, vol. 6, § 1955, pp. 5485-5487) states:
‘ ‘ The fact that a lease is a conveyance and not simply a continuing contract and the numerous authorities enforcing liability to pay rent in spite of destruction of- leased premises, however, have made it difficult to give relief. 'That the tenant has been relieved, nevertheless, in several cases indicates the gravitation of the law toward a recognition of the principle that fortuitous destruction of the value of performance by a *85 circumstance wholly outside the contemplation of the parties may excuse a promisor even in a lease.* * *
1 ‘ Even more clearly with respect to leases than in regard to ordinary contracts the applicability of the doctrine of frustra-, tion depends on the total or nearly total destruction of the purpose for which, in the contemplation of both parties, the transaction was entered into.”
In this ease, the foundation of the agreement is the creation of a facility in which the plaintiff would, through the joint efforts of both contracting parties, for a long term of years operate its supermarket business. Both the landlord and the tenant contracted to commit the property to this use and each was to incur substantial expense to render the premises suitable to the tenant’s use. Neither party contracted in the expectation of its early condemnation. For the tenant, the venture meant not only completing the alteration but the negotiating of the myriad of other transaction that would launch the business. Among these are arrangements for all the services required for the operation of the business, the hiring of employees and the establishment of sources of supply for its merchandise.
A copy of the resolution of the Board of Standards and Appeals of October 16, 1962 is annexed to the June 20, 1963-lease. It refers to objections that had been made by the Board of Education to the granting of the variance, and the variance itself contains restrictions predicated on the proximity of the school to the leased premises. It was not, therefore, within the contemplation of the parties that even before the plaintiff opened for business the Board of Education would alter its position to the point of taking the property as to which a variance had just been granted.
Although the lease makes numerous references to condemnation, the purpose of these references is to delineate the disposition of the award in the event of a taking.
The economic impact of condemnation affects the value of a parcel of real property before the actual vesting date. (Matter of City of New York [Duane St.], 54 Misc 2d 69; City of Buffalo v. Strossi, 54 Misc 2d 1031; Foster v. City of Detroit, 254 F. Supp. 655; Matter of City of New York [572 Warren St.], 58 Misc 2d 1073; Matter of City of New York [John F. Kennedy High School], N. Y. L. J., July 24, 1967, p. 10, col. 3; United States v. Miller, 317 U. S. 369.)
By April, 1964, when the parties became aware that the city was about to take the property, it was useless for the tenant to complete the improvement. Indeed it might have been *86 deemed an act of bad faith affecting the tenant’s right to claim damages in a condemnation proceeding to have continued installing fixtures and equipment in the face of an imminent condemnation. Failure to complete the work so as to procure the certificate of occupancy served no end in itself and the completion of the work was not “prevented by work then to be done in the demised premises by the tenant.”
Insofar as the parties bargained with respect to the allocation of the risks of unproductivity occurring after the signing of the lease, they uniformly placed the burden on the landlord. By the terms of the lease, the landlord was to receive no rent during the period during which it was procuring vacant possession. Bent w.as to be suspended during any periods required for reconstruction of the premises in the event of destruction. In both instances, the term of the lease is extended so that the tenant’s term in possession was to be measured without regard to such unproductive periods.
Where the tenant has not prevailed against the claim of frustration, the possession of the premises was fully available to it and .alternative uses of the property were possible. (Lloyd v. Murphy, 25 Cal. 2d 48; Grace v. Croninger, 12 Cal. App. 2d 603. See, also, 119 Fifth Ave. v. Taiyo Trading Co., 190 Misc. 123, affd. 275 App. Div. 695.) Such is not the case for this plaintiff.
I find that the April 12, 1964 action of the City of New York effectively frustrated the contract of the parties. I hold that the parties did not make the date 60 days subsequent to the completion of the landlord’s alteration the sole measuring event for the commencement of the obligation to pay rent. I hold the parties intended by the language in paragraph 37th, “ or on such date as the tenant opens the demised premises for business, whichever date shall occur sooner,” to measure the obligation to pay rent by the tenant’s capacity to operate its supermarket and that only in the event that the tenant was derelict in completing the alteration was the 60-day provision to measure the commencement of the obligation to pay rent. I hold the intervening event, the condemnation, not to be .such dereliction on the part of the tenant.
The plaintiff is entitled to judgment for the return of the rent claimed by the landlord for the period May 26, 1964 through August 12, 1964 and for interest on the security in the hands of the landlord for the period during which the landlord held such security.