Max Bloom, J.
Plaintiff (Beaux Arts), the owner of two buildings located on East 44th Street which, collectively, are operated as a hotel, seeks a determination declaring that chapter 345 of the Laws of 1968 (as amd. by L. 1969, ch. 1006 and L. 1971, ch. 623, is unconstitutional; that the implementation thereof by the plan proposed by United Nations Development Corp. (UNDO), and approved by Housing and Development Administration of the City of New York (HDA), by the City Planning Commission of the City of New York (CPC) and by the Board of Estimate, is unconstitutional; and that defendants, by exercising dominion and control over Beaux Arts’ property have, in effect, taken it without paying compensation therefor. The defendants, UNDC, the City of New York (City) and the State of New York (State), assert that the complaint fails to state a cause of action and each, by separate motion, seeks a dismissal thereof.
I
The Legislature, in first enacting the law, predicated its action upon a series of findings and determinations which recognized the growth, both in size and activity, of United Nations (UN) and the need to expand the facilities available to serve its needs and the needs of those, numbered in the thousands, who come daily to observe its functioning. The findings also take note that the absence of appropriate facilities in the immediate vicinity of UN’s headquarters requires that “heads of state and other dignitaries ” who attend sessions of UN must find accommodations in other parts of the City, thus imposing on the City ‘ ‘ great administrative and financial burdens in providing security for such persons.” The declared purpose of the act is to .serve “the interests of the state and city * * # and of the nation * * * by the coordinated development of facilities of the types described herein in the area contiguous to the United Nations area, that such coordinated development would stimulate private investment and participation in a comprehensive development program for the area, which may produce increased tax revenues, that the creation *787 of such facilities in a special district in accordance with a comprehensive plan will materially assist the effectuation of the public purpose served by the United Nations and promote the interests of the state and city * * # and of the nation, and that facilities of the types hereinbefore described would be useful to meet residential, business and industrial needs, when and to the extent not required by the persons and organizations for whose use and occupancy such facilities would be primarily intended.”
The 1968 act created UNDC as a public corporation consisting of 9 members, 2 of whom are the chairmen of HDA and CPC. Of the remaining 7 members, 2 were appointed by the Governor, and 5 by the Mayor after consultation with the Secretary-General of the UN and the United States Ambassador to UN. A two-block area adjacent to UN Headquarters was declared to be a UN development district. UNDC was directed to prepare a development plan for the district which was required to be submitted to HDA for approval. The plan, if approved by HDA, was then to be submitted to CPC. CPC, after a public hearing, was required to report to the Board of Estimate whether the plan was in accordance with the purposes of the law and conformed to a comprehensive plan for the development of the city as a whole, and whether the plan necessitated changes in the city plan and zoning regulations. Approval by the Board of Estimate gave finality to the plan.
The 1971 amendment enlarged the corporation from 9 to 15 members and delegated the power of appointment to the Governor over the 6 newly created vacancies. It also authorized UNDC to issue bonds, to provide security for these bonds in the manner therein provided, and to provide for debt service reserve funds. It also specified that, in the event that any debt service reserve fund fell below “ an amount equal to the maximum amount of principal and interest maturing and becoming due in any succeeding calendar year on the bonds of the corporation then outstanding and secured by such reserve fund ’ ’ (L. 1971, ch. 623, § 6, adding United Nations Development Corp. Act, § 10-c, subd. [3]) the State, upon certification in the manner provided by law, would pay into such debt service reserve funds such amounts as might be necessary to restore such funds to solvency. Payments thus made by the State are denominated as advances and are required to be repaid, “ subject only to the rights of the holders of any bonds or notes of [UNDC] theretofore or thereafter issued”. (United Nations Development Corp. Act, § 10-c, subd. [4].) The amendment expressly pro *788 vides that neither the State nor the city shall be liable for obligations of UNDO.
Most germane to, this proceeding is the provision in the 1971 amendment which limited the area of development specified in the 1968 statute. Although the development district set forth in the earlier law was not redefined, the 1971 amendment limited the development area to that portion of the development district lying easterly “of a line parallel to, and three hundred twenty-five feet westerly from the westerly side of United Nations Plaza.” (United Nations Development Corp. Act, § 16-a).
II
Prior to the enactment of the 1971 amendment Beaux Arts lay within the development district and within the area of contemplated development. Hence, when UNDO submitted its plan for the development of the district on November 12, 1969, it notified the tenants of Beaux Arts, apparently with the consent and co-operation of Beaux Arts, that the plan envisaged the eventual acquisition, of the property that you now occupy ’ ’ (italics supplied). However, it emphasized that, in light of the many .steps to be taken before eventual acquisition, “ there is no need for you to move now ” (italics in original). Indeed, it warned that immediate movement would result in a forfeiture of important relocation benefits which would accrue if the tenant were required to move after acquisition of the property by UNDO.
On May 1, 1970, UNDO notified the tenants of Beaux Arts, again, apparently with the consent and co-operation of Beaux Arts, that final approval to the plan of development had been given by the Board of Estimate on April 16, 1970. It informed the tenants that the development would proceed by stages and “that there is no need for you to move at this time and to remind you of the extensive relocation benefits that will become available to occupants who move after the [UNDO] buys the property in which they live and gives notice of intent to vacate. “ This is not a notice to move.” (Italics in original.)
The 1971 amendment excluded Beaux Arts from the area of development. UNDO, apparently in anticipation of the amendment, had theretofore proposed an amended plan which was approved by HD A, CBC and the Board of Estimate. It is this plan which is attacked by Beaux Arts in its first cause of action as unconstitutional upon the ground that it would provide primarily “ for a 250 room private hotel, and would also con *789 tain 300,000 square feet of private office space and space for private restaurant and retail store facilities.” This, it is contended, is a taking of private property for nonpublic uses in violation of the Federal and State Constitutions.
The third cause of action attacks the constitutionality of the 1971 amendment upon the ground that the provision which requires the State to keep the debt service reserve funds solvent constitutes a pledge of the State’s credit, in contravention of the State Constitution.
The second cause of action asserts that by reason of the publicity which followed in the wake of the adoption of the law by the Legislature and as a consequence of the letters of November 12, 1969 and May 1, 1970, the defendants exercised dominion and control over Beaux Arts’ property, with the result that many of its tenants have vacated; that tenants who have renewed leases have refused to pay rents ordinarily obtainable upon such renewal; and that prospective tenants have been discouraged from seeking space in its hotel. This, Beaux Arts insists, constitutes a de facto taking of its property, for which it is entitled to compensation.
Ill
The first argument advanced by defendants is directed to the first and third causes of action. They contend that Beaux Arts does not have standing to attack the constitutionality either of the statute as amended or of its implementation by UNDC, HD A, CPC and the Board of Estimate. It is now too firmly imbedded in our law to be questioned, particularly by a Judge sitting at nisi prius, ‘ ‘ that the constitutionality of a State statute may be tested only by one personally .aggrieved thereby, and then only if the determination of the grievance requires a determination of constitutionality * * * an unaggrieved citizen-taxpayer * * * lacks standing to challenge a statute’s constitutional validity” (St. Clair v. Yonkers Raceway, 13 N Y 2d 72, 76). “ Jurisdiction is not given to the courts as guardians of the rights of the people generally against illegal acts by the executive or legislature, but when a controversy arises between litigants, the court must then follow the Constitution and may incidentally pass upon an act of the executive or legislative branches while determining the individual rights of the parties.” (Matter of Donohue v. Cornelius, 17 N Y 2d 390, 397 [italics in original]; see, also, Doolittle v. Supervisors of Broome County, 18 N. Y. 155; Schieffelin v. Komfort, 212 N. Y. 520; Bull v. Stichman, 273 App. Div. 311, affd. 298 N. Y. *790 516; Dorsey v. Stuyvesant Town Corp., 299 N. Y. 512, cert. den. 339 U. S. 981).
It is an unfortunate truth that the rule sometimes places questioned acts either of the executive or Legislature beyond the pale of judicial determination. However, the constitutional separation of powers mandates that courts refrain from intruding into powers expressly reserved to another branch of government. Absent a personal stake by a litigant in the outcome of the controversy, the courts may not reach out to grasp and determine in the abstract, a constitutional question. Prior decisions of our highest court require that we must wait until the issue of constitutional validity has ripened into a form where concrete adversary positions illuminate the necessarily difficult determination (cf. Baker v. Carr, 369 U. S. 186).
Were the first and third causes of action the only causes it would be clear that Beaux Arts would have no standing to attack the constitutionality either of the statute or of its implementation. These, standing alone, create no specific adversary controversy. However, the second cause of action deals with the alleged infringement of a right belonging specifically to Beaux Arts. Accordingly it presents a concrete dispute which may be ripe for adjudication. Hence, Beaux Arts’ standing is dependent upon (a) the viability of that cause of action, and (b) whether a determination of constitutional validity is necessary to a determination of that issue.
IV
In the endeavor to establish its claim of “ de facto appropriation ” Beaux Arts alleges three separate acts. It asserts, first, that the passage of the United Nations Development Act and the preparation and announcement of the plans of implementation formulated by UNDO and approved by HD A, CPC and the Board of Estimate were attended by wide publicity, “caused and facilitated” by defendants. Secondly, it sets forth the letter of November 12, 1969, advising Beaux Arts’ tenants, among others, of the preparation of the plan by UNDC and that such plan, if approved by the requisite agencies, looked to the eventual acquisition of the property owned by Beaux Arts. The third, and final, act alleged is the letter of May 1, 1970, which notified the tenants of Beaux Arts (and others) of final approval of the plan by the Board of Estimate.
The term “ de facto condemnation ” is a much misused term. It has frequently been confused with “condemnation blight” (cf. Matter of City of New York [572 Warren St.], 58 Misc 2d *791 1073; City of Buffalo v. Strozzi, 54 Misc 2d 1031). The distinction between the two terms has been clarified by City of Buffalo v. Clement Co. (28 N Y 2d 241). The concept of a de facto appropriation is limited to situations in which there has been a direct invasion by the condemning authority upon the property of the condemnee or some direct legal restraint upon the use of such property. Condemnation blight, on the other hand, properly refers to the diminution in value of the property of the condemnee, caused by acts of the condemning authority between the time of the announcement of the projected taking and the de jure vesting of title (City of Buffalo v. Irish Paper Co., 31 A D 2d 470, affd. 26 N Y 2d 869). “ There is in fact a marked distinction between those cases which by reason of the cloud of condemnation, resulting in so-called condemnation blight, per-
mit the claimant to establish his true value at the time of the taking but as if it had not been subjected to the debilitating effect of the threat of condemnation [citing case], and those cases which go even further and declare that the acts of the condemnor constitute a de facto taking long before the filing of the appropriation maps [citing cases]. One is the product of acts which result, realistically speaking, in no less than an out and out appropriation of property, requiring in turn that the owner be fully compensated, while the other relates more properly to certain affirmative value-depressing acts on the part of the condemning authority, requiring only that evidence be received of value prior to such acts in an effort to arrive at just compensation. Both concepts owe their existence to the law’s efforts to secure full compensation; they differ only insofar as one involves essentially the rules of appropriation while the other relates to the rules of evidence.” (City of Buffalo v. Clement Co., supra, p. 254). Thus, Matter of Keystone Assoc. v. Moerdler (19 N Y 2d 78), is a classic illustration of de facto appropriation. In that case the Metropolitan Opera Association vacated the building, located at 40th Street and Broadway, which it had used for almost a century. It leased the premises to Keystone Associates, at a substantial annual rental, for a term of 50 years, with the proviso that Keystone was to demolish the opera house and erect a 40-story office building on the premises. This building was to become the property of the Opera Association upon the expiration of the lease. The Legislature, anxious to preserve this reminder of a simpler and more gracious era, created a private corporation and authorized it to condemn the property. The statute authorized the City Commissioner of Buildings to refuse to issue a demolition permit for a period *792 of 180 days, provided that the trustees of the corporation deposited the sum of $200,000 to stand as security for damages in the event that it failed to condemn the property. The court held that the restraint exercised on the use of the property by the statute ‘ ‘ not being incidental to the lawful exercise of the police power, is equally unreasonable and constitutes a taking of property for which just compensation must be paid if the statute is to be upheld ” (p. 88). (See, also, Forster v. Scott, 136 N. Y. 577; Leeds v. State of New York, 20 N Y 2d 701; 2 Nichols, Eminent Domain, § 6.21.) Nor is it material that a de facto appropriation is followed by a de jure taking. In such event the taking is the date of the de facto condemnation and nothing is added by making it de jure (Lambert v. State of New York, 30 A D 2d 582).
Equally illustrative of condemnation blight is City of Buffalo v. Irish Paper Co. (31 A D 2d 470, 26 N Y 2d 869, supra). There, in 1954, the City initiated a redevelopment project in an area which included the property of the paper company. The plan received widespread publicity in 1961 and in 1962 the paper company’s tenants were notified that the property soon would be taken. This was followed by notice to the paper company that demolition would soon begin. The property which, between 1954 and 1961, had been fully occupied, became vacated in 1962. Title to the property was not taken until 1968. In the interim, the value of the building deteriorated substantially. The court held that the acts of the City in instructing the tenants to vacate the property and in notifying the paper company that demolition was soon to begin, had engaged in value-depressing acts from which it was not entitled to benefit. £ ‘ In these circumstances it is proper that the property be evaluated on the basis of its value except for such affirmative value-depressing acts by the city ” (p. 476); (to the same effect, see Niagara Frontier Bldg. Corp. v. State of New York, 33 A D 2d 130, affd. 28 N Y 2d 755; City of Buffalo v. Strozzi, 54 Misc 2d 1031, supra; United States v. Virginia Elec. Co., 365 U. S. 624).
Here, there is no doubt that Beaux Arts is seeking judgment for a purported de facto taking of its property. Testing the acts of which it complains by the standards set forth, there is no basis for casting the defendants in liability. Publicity, even though widespread to the point where it may indicate a pattern of agitation, does not constitute an invasion of property, nor does it constitute a legal restraint on the beneficial use and free enjoyment of the realty (City of Buffalo v. Clement Co., 28 N Y 2d 241, supra); nor does the transmission of letters which assert *793 that condemnation may occur at some future date and emphasize that there is no intent to interfere with present use and enjoyment constitute such an act of dominion as to limit the right of use and enjoyment. These acts, individually and in the aggregate, furnish no basis for the claim of de facto appropriation.
It is undeniably true that damage may sometimes accrue to the owner of realty from the mere possibility of invasion by the sovereign, or by those acting on its behalf. In such event the damage is the realization of a peril which flows as a natural consequence from the ownership of realty. It does not bring compensable injury in its wake (Sauer v. City of New York, 180 N. Y. 27, affd. 206 U. S. 536; Transportation Co. v. Chicago, 99 U. S. 635; Danforth v. United States, 308 U. S. 271).
V
Inasmuch as the second cause of action fails to set forth a viable claim against defendants, it follows that plaintiff does not have standing to attack the constitutionality of the act, nor does it have standing to attack the implementation thereof. Accordingly, the motion to dismiss is granted.